JOSEPH F. HALL, PLAINTIFF, v. MAYOR AND DIRECTOR OF PUBLIC SAFETY IN THE TOWNSHIP OF PENNSAUKEN, TOWNSHIP OF PENNSAUKEN AND CHIEF OF POLICE OF TOWNSHIP OF PENNSAUKEN, DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided August 8, 1979.

308

*Mr. Isaiah Steinberg* for plaintiff Joseph F. Hall.

*Mr. Mario A. Iavicoli* for defendants Mayor and Director of Public Safety of Pennsauken Township and Chief of Police of Pennsauken Township.

DEIGHAN, J. S. C.

█ This is an action to review and set aside a five-day suspension of a police officer following a departmental hearing for violation of the Pennsauken Police Department's rules and regulations. Plaintiff seeks a judgment declaring certain of the rules and regulations unconstitutional; for compensatory and punitive damages and for counsel fees and costs. The matter was tried *de novo* on the record before the departmental board.[1]

---

[1]Pennsauken Township is under the Civil Service Act. Normally the review would be by the Civil Service Commission. *N.J.S.A.* 11:15–1 *et seq.* The matter is properly before this court since it involves only a five-day suspension. *Perrapato v. Rose*, 83 *N.J.Super.* 245, 248–249 (App.Div.1964); *Akridge v. Barres*, 118 *N.J.Super.* 557, 561 (Ch.Div.1972), aff'd 122 *N.J.Super.* 476

Prior to September 13, 1977 plaintiff received a preliminary notice of disciplinary action wherein he was charged with violation of Article I, § 10, of the Rules and Regulations of the Pennsauken Police Department which provided:

Article I—Conduct unbecoming an officer

\* \* \* \* \* \* \* \*

Section 10—Publicly criticizing the official action of a superior officer

On August 10, 1977 an article appeared in the *Courier Post* newspaper reporting that a suit had been instituted by the Chief of Police of the Township of Pennsauken, Nicholas J. Petitte, against the Camden County Welfare Board to ascertain whether any police officer of the Pennsauken Police Department had applied for welfare assistance. The article quoted Chief Petitte as stating that the suit involved "compelling interest in the integrity of the [township's] police officers." He indicated that if any officer improperly applied for welfare it would cast doubt on the moral character of the police officers.

At about 3 a. m. on August 10, 1977 plaintiff, while attending a convention in Rhode Island, received a telephone call from a newspaper reporter. He was advised by the reporter that Chief Petitte had filed the action, and during the course of the conversation it apparently was mentioned that plaintiff was considered to be a target of the lawsuit. He explained to the reporter that in 1974 four or five police officers with large families applied and qualified for food stamps, not welfare, because they were being paid a minimum wage. Neither plaintiff nor any other officer was mentioned in the lawsuit.

In commenting upon the action instituted by Chief Petitte the article stated:

---

(App.Div.1973), aff'd 65 *N.J.* 266 (1974), *cert.* den. 420 *U.S.* 966, 95 *S.Ct.* 1361, 43 *L.Ed.2d* 445 (1975); *Wallace v. Bridgeton,* 121 *N.J.Super.* 559 (Law Div. 1972).

■■■■■■■■■■■■■■

Hall charged the suit was filed by Petitte in retaliation for a complaint Hall filed with the State Public Employees Relations Commission after he allegedly was bypassed for a promotion. The complaint is pending.

As a result of the departmental hearing plaintiff was found guilty of violation of the regulation. The disciplinary board concluded that public criticism on the part of a police officer does irreparable damage to the entire department and that plaintiff committed an irresponsible act in subjecting the department to public criticism without substantiated information.

Plaintiff contends that his actions did not constitute public criticism of the official actions of the Chief of Police; that the ordinance is unconstitutional in that it is an abridgement of plaintiff's right of speech; that the rule is invalid and the resulting suspension is a penalty for the exercise of constitutional right; that he was improperly suspended and that the ordinance is unreasonable.

Plaintiff, in contending that Art. I, § 10, is violative of the First and Fourteenth Amendment to the Constitution of the United States and unenforceable, relies basically upon *Muller v. Conlisk*, 429 *F.2d* 901 (7 Cir. 1970), and *Gasparinetti v. Kerr*, 568 *F.2d* 311 (3 Cir. 1977), *cert.* den. 436 *U.S.* 903, 98 *S.Ct.* 2232, 56 *L.Ed.2d* 401 (1978). Defendants assert that Art. I, § 10, does not violate the First Amendment as made applicable to the states and its instrumentalities by the Fourteenth Amendment. They rely upon *Arnett v. Kennedy*, 416 *U.S.* 134, 94 *S.Ct.* 1633, 40 *L.Ed.2d* 15 (1974); *Kannisto v. San Francisco*, 541 *F.2d* 841 (9 Cir. 1976), *cert.* den. 430 *U.S.* 931, 97 *S.Ct.* 1552, 51 *L.Ed.2d* 775 (1977), and *Aycock v. Police Comm. of Bd. of Aldermen*, 133 *Ga.App.* 883, 212 *S.E.2d* 456 (App.Ct.1975).

■ While members of a police department are necessarily subject to reasonable disciplinary rules and regulations and must surrender some individual rights and freedom *Akridge v. Barres, supra,* 118 *N.J.Super.* at 563 (citing 16 *McQuillin, Municipal*

*Corporations* (3 ed. 1972), § 4516); *Newark v. Massey*, 93 *N.J.Super.* 317, 323 (App.Div.1967), there is no doubt that they have full First Amendment rights. *Garrity v. New Jersey*, 385 *U.S.* 493, 500, 87 *S.Ct.* 616, 620, 17 *L.Ed.2d* 562, 567 (1967); *Wood v. Georgia*, 370 *U.S.* 375, 82 *S.Ct.* 1364, 8 *L.Ed.2d* 569 (1962); *In re Gioglio*, 104 *N.J.Super.* 88, 248 *A.2d* 570 (Cty.Ct.1968). But since he is held up as a model of proper conduct, the obligations of a police officer are greater than the ordinary governmental employee. *In re Emmons*, 63 *N.J.Super.* 136, 141–142 (App.Div. 1960).

In *Gasparinetti v. Kerr, supra*, the Third Circuit Court of Appeals recognized

* * * a significant government interest in regulating some speech of police officers in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution. To achieve these ends, regulations may be promulgated, but their restrictive effect may extend only as far as is necessary to accomplish a legitimate governmental interest. [568 F.2d at 315–316] [2]

■ The First Amendment right of freedom of speech as extended to public employees may be violated if rules or regulations impeding speech are unconstitutionally vague or overbroad. *Arnett v. Kennedy, supra*, 416 *U.S.* at 159, 94 *S.Ct.* at 1649, 40 *L.Ed.2d* at 36 (1974); *Grayned v. City of Rockford*, 408 *U.S.* 104, 108–109, 114, 92 *S.Ct.* 2294, 2298, 2302, 32 *L.Ed.2d* 222 (1972). Such rules and regulations are also subject to consideration of due process and reasonableness. *Jansco v. Waldron*, 70 *N.J.* 320, 328 (1976); *Rusignuolo v. Orechio*, 70 *N.J.* 330, 337 (1976).

---

[2]For further amplification of the balancing of the rights and responsibilities of public officers *vis a vis* municipalities, see 16 *McQuillin, supra*, §§ 45.09, 45.09(a) and 45.16. See also, Note "The First Amendment and Public Employees—An Emerging Constitutional Right To Be a Policeman?", 37 *Geo. Wash.L.Rev.* 409 (1968).

■ The government has a right to curtail freedom of speech by its employees, but it has a corresponding duty to set forth its prohibition with reasonable clarity and particularity. *Meehan v. Macy*, 129 *U.S.App.D.C.* 217, 232, 392 *F.2d* 822, 837 (1968) *modified* 138 *U.S.App.D.C.* 38, 425 *F.2d* 469, aff'd *en banc* 138 *U.S.App.D.C.* 41, 425 *F.2d* 472 (1969). Any such regulation or restriction on First Amendment rights is to be narrowly drawn. *Keyishian v. Bd. of Regents*, 385 *U.S.* 589, 87 *S.Ct.* 675, 17 *L.Ed.* 2d 629 (1967), and must be in terms susceptible of objective measurement. *Cramp v. Bd. of Public Instruction*, 368 *U.S.* 278, 286, 82 *S.Ct.* 275, 280, 7 *L.Ed.2d* 285 (1961). The rules and regulations must be "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *CSC v. National Ass'n of Letter Carriers*, 413 *U.S.* 548, 579, 93 *S.Ct.* 2880, 2897, 37 *L.Ed.2d* 796 (1973).

■ On the other hand, an employee cannot indiscriminately invoke his First Amendment freedom as a bar to disciplinary action when his utterance becomes disruptive of his own work and injurious to the efficiency of his employment unit. *Arnett v. Kennedy, supra; Pickering v. Bd. of Ed.*, 391 *U.S.* 563, 88 *S.Ct.* 1731, 20 *L.Ed.2d* 811 (1968); *Jenson v. Olsen*, 353 *F.2d* 825 (8 Cir. 1965). The public employee may speak freely so long as he does not impair the administration of the public service in which he is employed. *In re Gioglio, supra*, 104 *N.J.Super.* at 98. The constitutional right of a public employee may not override the basic obligation of an employee to an employer. Free speech does not endow a public employee with a license to vilify superiors in public. The employer-employee relationship restrains the right of the employee to the extent reasonably necessary to retain that harmony and loyalty which is necessary to the efficient and successful operation of government. *Pietrunti v. Brick Tp. Bd. of Ed.*, 128 *N.J.Super.* 149, 166 (App.Div. 1974), certif. den. 65 *N.J.* 573 (1974), *cert.* den. 419 *U.S.* 1057, 95 *S.Ct.* 640, 42 *L.Ed.2d* 654 (1974).

In the landmark case of *Pickering v. Bd. of Ed., supra,* the United States Supreme Court recognized that the proper analysis in such a situation requires a comparison of respective interests. While the Supreme Court declined to lay down a general standard under which critical statements may be adjudged (391 *U.S.* at 568, 88 *S.Ct.* at 1735, 20 *L.Ed.*2d at 817, 818), it acknowledged that it was necessary in each case to balance the interest of the state as an employer against the employees interest as a citizen in speaking out on matters of public concern. (391 *U.S.* 568, 88 *S.Ct.* at 1734, 20 *L.Ed.*2d at 817).

In *Pickering* a schoolteacher, in a published letter, criticized the action of the board of education. The court noted that the schoolteacher's critical statements (1) were not directed to any person with whom he would be in daily contact and (2) created no problem of maintaining discipline by immediate superiors or harmony among coworkers because there was no close relationship between the teacher and the Board of Education.

The conflict between plaintiff and defendants in this case depends upon the interpretation as to whether Art. 1, § 10, of the Pennsauken Police Department Rules and Regulations (which defines as conduct unbecoming an officer an act of publicly criticizing the official action of a superior officer) is unconstitutionally vague and overbroad. Plaintiff, in support of his position, relies on *Gasparinetti v. Kerr, supra.* In *Gasparinetti,* the following regulation was deemed to be unconstitutionally overbroad:

Chapter 6:7 PUBLIC DISPARAGEMENT—Department members shall not publicly disparage or comment unfavorably or disrespectfully on the official action of a superior officer, nor on the Rules, Regulations, Procedures or Orders of the Police Department.

The Third Circuit Court of Appeals did not deal with the term "publicly disparage" but predicated its decision as to the unconstitutionality of the regulation on the overbreadth of the term "comment unfavorably." 568 *F.*2d at 316. The *Gasparinetti*

court, relying upon *Pickering v. Bd. of Ed., supra,* noted that Gasparinetti's comment (1) concerned matters of public interest, (2) did not concern immediate superiors or anyone with whom he came into contact and (3) that Gasparinetti was not involved in the incidents commented upon. 568 *F.*2d 311, note 15.

In these respects, *Gasparinetti* is readily distinguishable, from the present case. While the issue of welfare fraud by police officers is in the public interest, the comment by Hall was a personal attack impugning the motivation of Chief Petitte. Also, unlike *Gasparinetti,* the comments under consideration concerned an immediate superior officer and Hall was personally involved in the incident. Lastly, in *Gasparinetti,* the majority opinion recognizes that the term "public criticism" is far narrower in its restrictive scope than the regulation therein involved. 568 *F.*2d at 318, note 20.

The *Gasparinetti* court at 317, 318 relied upon *Muller v. Conlisk, supra,* and *Flynn v. Giarrusso,* 321 *F.Supp.* 1295 (E.D. La.1971), as precedent for overbreadth of the regulation. But, as pointed out by the dissent (568 *F.*2d 324), *Muller* proscribed *all* criticism (both public and private), and *Flynn* prohibited criticism of *any person.* In the subsequent case of *Magri v. Giarrusso,* 379 *F.Supp.* 353 (E.D.La.1974), the same District Court upheld the same rule previously struck down in *Flynn* because it was revised and limited to public speech. Since it no longer applied to private speech, the court found that the regulation was not overbroad. 379 *F.Supp.* 358. The term "publicly criticize," as used in the regulation of Pennsauken Township, is the precise terminology upheld in *Magri.*

If the phrase "for such cause as will promote the efficiency of service" (*Arnett v. Kennedy, supra*) and "conduct unbecoming an officer" (*Parker v. Levy,* 417 *U.S.* 733, 94 *S.Ct.* 2547, 41 *L.Ed.* 2d 439 (1974); *Meehan v. Macy, supra; In re Emmons, supra,* 63 *N.J.Super.* at 140 (conduct unbecoming an officer is an "elastic" phrase)), do not violate the overbreadth doctrine then, *a fortiori,*

a refinement thereof by the term "public criticism" likewise does not violate that doctrine. See *Magri v. Giarrusso, supra,* 379 *F.Supp.* at 358.

The Supreme Court in *Arnett v. Kennedy, supra,* in quoting from *Meehan v. Macy, supra,* 416 *U.S.* at 161, 94 *S.Ct.* at 1648, 40 *L.Ed.2d* at 37, stated:

> \* \* \* [I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes "catchall" clauses prohibiting employee "misconduct", "immorality", or "conduct unbecoming." We think it is inherent in the employment relationship as a matter of common sense if not [of] common law that [a Government] employee \* \* \* cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory [cartoons] \* \*. [Dismissal in such circumstances neither] comes as unfair surprise [nor] is so unexpected \* \* \* as to chill \* \* \* freedom to engage in appropriate speech.

As to the constitutional restriction on vagueness, the term itself is evasive and ephemeral. In *Bence v. Breier,* 357 *F.Supp.* 231 (E.D.Wis.1973), aff'd, 501 *F.2d* 1185, 1188 (7 Cir. 1974), *cert. den.* 419 *U.S.* 1121, 95 *S.Ct.* 804, 42 *L.Ed.2d* 821 (1975), the limitations of the term "vague" were recognized:

> Vagueness, however, is a matter of degree and context. We recognize that "there are limitations in the English language with respect to being both specific and manageably brief." *United States Civil Service Commission v. National Association of Letter Carriers, AFL-CIO,* 413 *U.S.* 548, 578–579, 93 *S.Ct.* 2880, 2897, 37 *L.Ed.2d* 796 (1973), and that "(c)ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford, supra,* 408 *U.S.* at 110, 92 *S.Ct.* at 2300. Moreover, we recognize that there "are areas of human conduct where, by the nature of the problems presented, legislatures simply cannot establish standards with great precision." *Smith v. Goguen,* 415 *U.S.* 566, 581, 94 *S.Ct.* 1242, 1251, 39 *L.Ed.2d* 605, 42 *U.S.L.W.* 4393, 4398 (Mar. 25, 1974) and therefore the vagueness doctrine is "not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky,* 407 *U.S.* 104, 110, 92 *S.Ct.* 1953, 1957, 32 *L.Ed.2d* 584 (1972). Yet, the "root of the vagueness doctrine is a rough idea of fairness." [501 *F.2d* at 1188–1189]

For venomous and vitriolic criticism of superiors not constitutionally protected, see *Roseman v. Indiana University*, 520 *F.*2d 1364 (3 Cir. 1975), *cert.* den. 424 *U.S.* 921, 96 *S.Ct.* 1128, 47 *L.Ed.* 2d 329 (1976); *Sprague v. Fitzpatrick*, 546 *F.*2d 560 (3 Cir. 1976); *Duke v. North Texas St. Univ.*, 469 *F.*2d 829 (5 Cir. 1973), *cert.* den. 412 *U.S.* 932, 93 *S.Ct.* 2760, 37 *L.Ed.*2d 160 (1973). See also: *Aycock v. Police Committee, supra*, where the Court of Appeals of Georgia held a regulation stating that "Patrolmen and other members of the department are strictly forbidden from criticizing the official acts of their superior officers," was reasonable and constitutional where the officer made derogatory remarks about his superior officer.

In *Kannisto v. City of San Francisco, supra*, a police lieutenant, Kannisto, was suspended for describing his superior officer to his subordinates as an "unreasonable, contrary, vindictive individual," whose behavior was "unreasonable, belligerent, arrogant, contrary and unpleasant." The court found that even though the regulation might ultimately be found to apply to a protected area of behavior under the First Amendment, the remarks made by Kannisto about his immediate superior had such a disruptive influence on obedience and harmony in the police force that they were not entitled to protection. The court stated (at 845), "there could be no reasonable doubt on Kannisto's part that a disparaging attack on his superior officer, communicated to patrolmen in the regular course of duty would tend to 'subvert the good order, efficiency or discipline of [the] department.'"

Similarly, in *Pietrunti v. Brick Tp. Bd. of Ed., supra*, 128 *N.J.Super.* at 168 [3] the court denied protection to a teacher who used abrasive and derogatory language in describing the super-

---

[3] In *Pietrunti*, the terms "conduct unbecoming a teacher" and "unladylike and unfeminine" passed constitutional muster. *Id.* at 153–155.

intendent of schools.   In finding no public interest in the teacher's remarks, the court stated that:

> An aggressive, contentious and perhaps, controversial teacher working within the structure of the school district as a faculty member and/or as an education association representative may confidently look to the First Amendment as a protective shield for his or her activities;   however, an intemperate, venomous employee be he or she a teacher or otherwise, cannot claim constitutional protection when he or she attacks his or her superiors in public brawling terms for no purpose discernable other than to satisfy some personal need.

While the public criticism of Hall concerning Chief Petitte is not nearly as offensive as the criticism in *Roseman, Sprague, Duke* and *Pietrunti*, the disciplinary measure of discharge in those cases cannot compare to the five-day suspension involved herein.

■■■   The constitutional validity of a rule or regulation concerning constitutional rights of a public employee depends upon the facts and circumstances surrounding each case.   *Rusignuolo v. Orechio, supra,* 70 *N.J.* at 337, 338.   Under the factual setting in this case the comments of the plaintiff constitute a public criticism of a superior officer and did not involve a matter of public interest.   The term "public criticism" is not so constitutionally vague or overbroad as to violate the plaintiff's First Amendment rights.   The regulation therefore is valid and the five-day suspension is reasonable.   The findings and determinations of the disciplinary board of Pennsauken Township are affirmed.[4]   Since the proceedings are affirmed, no reimburse-

---

[4]But *cf.* the recent case of *Ramirez v. Hudson Cty.,* 167 *N.J.Super.* 435 (Law Div.1979), where *Gasparinetti, Muller* and *Flynn* are also contrasted with *Magri* and *Kannisto.*   In *Ramirez* a regulation requiring *all information* to be authorized and to be given out through the warden infringed upon the First Amendment rights of a correctional officer who criticized pay discrimination in a newspaper article.   The case concerned a matter of public interest and did not involve criticism of a public superior officer.   It has been pointed out that such a regulation may be violated even though an interview was comple-

ment for expenses of the plaintiff's defense are allowable under *N.J.S.A.* 40A:14–155. *Waterford Tp. v. Babli*, 158 *N.J.Super.* 569 (Law Div.1978), aff'd 168 *N.J.Super.* 18 (App.Div.1979).

An order may be presented dismissing the complaint without costs.

mentary to the operation of the department. *In re Gioglio, supra,* 104 *N.J.Super.* at 96, 100.