**Van H. FLYNN**

v.

**Clarence B. GIARRUSSO, Superintendent of Police of the City of New Orleans, Bernard B. Levy, Chief Administrative Officer of the City of New Orleans, the Honorable Moon Landrieu, Mayor of the City of New Orleans, and the City of New Orleans [1].**

Civ. A. No. 70–3570.

United States District Court, E. D. Louisiana, New Orleans Division.

Jan. 25, 1971.

---

[1]. The City of New Orleans was withdrawn as a defendant by the plaintiff. At the close of the evidence, the Court directed a verdict in favor of defendants Bernard B. Levy, Chief Administrative Officer of the City of New Orleans and The Honorable Moon Landrieu. Mayor of the City of New Orleans. Hill v. City of El Paso, 437 F.2d 352 (5th Cir. 1971).

Irwin R. Sanders, James R. Sutterfield, New Orleans, La., for plaintiff.

Charles C. Foti, Jr., Charles Ward, Asst. City Attys., New Orleans, La., for defendants.

HEEBE, District Judge:

The plaintiff, Van H. Flynn, a lieutenant of the New Orleans Police Department, was suspended from the force for writing an article critical of the police administration. In the article, entitled "Who's Shaking the Political Plum Tree?????" Lt. Flynn claimed that (1) parking spaces in the police complex were reserved for "sacred cows" instead of on-duty policemen required to testify in the adjoining court building and that (2) the men of the narcotics division were "glamour boys" who refused to assist the patrolmen in narcotics arrests in the early morning hours.

This article was published in the SANO NEWSLETTER, a newsletter of Local 114 of the International Brotherhood of Police Officers. The newsletter's prime circulation is intended for members of the Local 114, Supervisors Association of New Orleans. Distribution is usually accomplished by leaving stacks of the letters around the police stations.

Lt. Flynn was suspended from duty for violations of Articles 35, 27, 80 and 83 of the Rules for the Administration of the Department of Police. In this action for injunctive relief and damages, Lt. Flynn challenges the constitutionality of his suspension on two grounds: (1) that it violates his First Amendment rights of free speech and association, and (2) that he was suspended under police regulations which, on their face, suffer from those two everyday constitutional maladies—vagueness and

overbreadth. Because we agree that the regulations under which he was suspended are constitutionally infirm, we do not reach the first issue.

 Initially, we must reject defendant's challenge to this Court's jurisdiction. While it is true that only personal and not property rights can be enforced under 28 U.S.C. § 1343,[2] defendant has improperly characterized Lt. Flynn's claim as one for the enforcement of a property right. Lt. Flynn is not simply seeking reinstatement and back pay (property rights). He is chiefly seeking redress for an alleged infringement of his First Amendment rights, viz., he alleges he was suspended solely for writing an article in which he was asserting his rights of free speech. Rainey v. Jackson State College, 435 F.2d 1031 (5th Cir. 1970) (No. 30558). As was stated in Pred v. Board of Public Instruction of Dade County, 415 F.2d 851 (5th Cir. 1969):

"The right sought to be vindicated is not a contractual one. * * * What is at stake is the vindication of constitutional rights—the right not to be punished by the State or to suffer retaliation at its hand because a public employee persists in the exercise of First Amendment rights." At 856.

Accord, Moreno v. Henckel, 431 F.2d 1299 (5th Cir. 1970); Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970). Thus, this Court has jurisdiction under 42 U. S.C. § 1983.

 It is clear that, subject to applicable libel laws, every citizen has the First Amendment right to criticize public officials on their official conduct and to comment on matters of public interest.[3] The reason such speech is protected by the First Amendment is because full discussion of public affairs is

2. Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969).

3. St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323. 20 L.Ed.2d 262 (1968); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir.), cert. den. 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969). Cf., Greenbelt Co-op. Publ. Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (public figure).

the cornerstone of self government and our democracy. There exists a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

But Lt. Flynn is not merely a private citizen adding his remarks to a current public discussion or criticizing public officials. Rather, Lt. Flynn is an employee of the police force, communicating to other employees of the police force certain complaints of internal police matters.

■ Pickering v. Bd. of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), recognizes that the state, as an employer, has a legitimate interest and right in regulating to some degree the speech of its employees. In *Pickering,* the Court held that a public school teacher could not be dismissed from his position because he wrote to a newspaper two letters which were critical of the school board's handling of past proposals to raise new revenue for the county schools. *Pickering* recognizes as legitimate the interests the state, as an employer, has in (1) promoting efficiency in the public services it performs, (2) maintaining discipline by immediate superiors, (3) fostering harmony among coworkers and (4) exacting loyalty and confidence for certain jobs requiring these traits.

■ The fact that Flynn is a policeman and, as such, a public employee, does not, in itself, muzzle him from criticizing the police department. "[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly

rejected." Keyishian v. Board of Regents, 385 U.S. 589, 605–606, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967). Rather, we must "arrive at a balance between the interests of the [police officer] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Education, *supra,* 391 U.S. at 568, 88 S.Ct. at 1734.

■ Without deciding what restrictions the state, as an employer, may place on the First Amendment rights of its employees, the Court now looks to the police regulations under which Flynn was suspended to see if they put an unconstitutional restraint on the free speech of any policeman. If the regulations, presumably enacted in good faith to effectuate a quasi-military discipline and promote a harmonious esprit-de-corps, inhibit even constitutionally protected expression, then these regulations cannot stand under the Constitution. Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). " * * * [E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).[4]

We do not decide here whether Lt. Flynn's conduct could have been regulated by narrower regulations since a regulation

" * * * may be invalid it it prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct. For in appraising a statute's inhibitory effect upon such rights, this Court has not hesitated to take into account pos-

---

4. *See,* Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Win-

ters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

sible applications of the statute in other factual contexts besides that at bar. \* \* \* The objectionable quality of vagueness and overbreadth \* \* \* [is due to] the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." N.A. A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963).

■ The challenged regulations are impermissible if on their face they are either vague or overbroad. A regulation is vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. \* \* \*" Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). A regulation is void for overbreadth if "it offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms'. \* \* \* [cases omitted]" Zwickler v. Koota, 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967).

Article 35 states:

"Defamation—A member shall not unjustly criticize or ridicule, or express hatred or contempt toward, or indulge in remarks which may be detrimental to, or cast suspicion on the reputation of, or otherwise defame, any person."

This regulation is overbroad. In Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970), a similar Chicago Police Department rule prohibiting "any activity, conversation, deliberation, or discussion which is derogatory to the Department" was struck as overbroad. Article 35 is even broader. Like the Chicago regulation, it does not distinguish between public speech or private speech, speech among policemen and speech between policemen and third parties, whether their wives, husbands, or strangers not concerned with the police department. Unlike the Chicago regulation, it prohibits a police officer from criticizing "any person"— not just fellow officers. We fail to see what possible legitimate interest the New Orleans Police Department can have to warrant such a sweeping prohibition on the speech of its members.

■ This regulation is also vague. The United States Supreme Court in Winters v. New York, 333 U.S. 507, 516–517, 68 S.Ct. 665, 92 L.Ed. 840 (1948) cited with approval State v. Klapprott, 127 N.J.L. 395, 22 A.2d 877. *Klapprott* struck a criminal statute which prohibited "Any \* \* \* language \* \* \* which in any way incites, counsels, promotes, or advocates hatred, abuse, violence or hostility \* \* \*" as being too indefinite and thus violative of the individual's freedom of expression. The New Jersey court said "that the terms 'hatred,' 'abuse,' 'hostility,' are abstract and indefinite admits of no contradiction. \* \* \* Is it to be left to a jury to conclude beyond reasonable doubt when the emotion of hatred or hostility is aroused in the mind of the listener as a result of what a speaker has said? Nothing in our criminal law can be invoked to justify so wide a discretion." Nothing better could be said for the words in Article 35.

Article 27 states:

"Standard of ethics—A member shall always conduct himself in accordance with the highest degree of morality which is required of the law enforcement profession.

"He shall act in a manner which will not reflect discredit upon himself or the Department."

■ This statute is, on its face, unconstitutionally vague. It does not set forth any standard against which any reviewing board or court could scrutinize the activity of a policeman to determine what the "highest degree of morality" would be. The "highest degree of morality" standard set forth here is sim-

ilar to the "sacrilegious" standard struck for vagueness in Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). There, the Court struck, as restrictive of free speech, a New York statute which authorized a censor of movies to deny a license to exhibit any film which was "sacrilegious." In commenting on how vague and standardless the term "sacrilegious" was, the Court said,

> "In seeking to apply the broad and all-inclusive definition of 'sacrilegious' given by the New York courts, the censor is set adrift upon a boundless sea amid a myriad of conflicting currents of religious views, with no charts but those provided by the most vocal and powerful orthodoxies."

Terming Lt. Flynn's criticism of certain operations of the police department immoral indicates just how standardless this term is.

Likewise, the term "reflect discredit" is impermissible. It vests broad and unfettered discretion in the enforcing official to determine just what conduct "reflects discredit." By offering no standards to guide an officer's everyday conduct so that he may know when he risks violating the regulation, it can easily deter protected speech.

Article 80 states in pertinent part: [5]

"Security of operations—The operations of the Department shall be conducted in a confidential manner.

"A member shall not impart to any person the content of any official instruction, policy, or record, or the conduct of departmental functions; except in the performance of duty as directed by a superior officer, or under due process of law."

Article 83 states:

"Public statements—A member shall not publicly publish, or cause or allow to be published, his statement concerning official business or law enforcement policy without the prior approval of the Superintendent."

These articles also suffer from many of the infirmities analyzed above.[6] For example, an officer is prohibited from criticizing "the conduct of departmental functions." Suppose an officer knows that the functions of his department are being conducted inefficiently or corruptly—that his immediate superiors are being lax or taking graft. These regulations seem to inhibit his exposure of these activities. Their vice is more evident where, as in *Muller*, it appears to the officer that the investigating division of the police department is likewise corrupt, and the public interest in such knowledge can only be protected through public exposure.

The regulations also use such vague terms as "official" and "confidential." We agree that there is a strong public need in keeping some "official" police operations "confidential." However, we have been unable to find, and counsel for the police have not cited, any definition in the police regulations of these terms. The police officer apparently must gamble at their meaning with his job security and the attendant public interest as the stakes.

The point is that these regulations sweep far broader than necessary to advance the legitimate interests of the police department as an employer. An officer's speech is so subject to the restraints of either prior approval by superiors or subsequent discipline, restraints which are left to the unfettered discretion of enforcing police officials, that we fail to see how an officer can exercise his First Amendment rights rationally and intelligently. As police officers "steer far wider of the unlawful

---

5. Article 80 contains two other sections which do not appear relevant to this dispute.

6. Article 83 may also be an unconstitutional prior restraint on free speech to the extent that it requires a police officer to seek approval of the Superintendent before publishing protected speech. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

zone," [7] the public, for whose benefit the Constitution protects many types of speech, is bound to suffer, and this is impermissible.

■ Since the regulations under which Lt. Flynn was dismissed are facially invalid as an abridgment of the First Amendment right to free speech as made applicable to the state by the Fourteenth Amendment, it is unnecessary for this Court to determine whether the *actual* statements made by Lt. Flynn are constitutionally protected by the First Amendment. The state may, consistent with its legitimate interests as an employer, regulate to an extent the *conduct* and *speech* of its employees. This Court need not speculate what conduct or speech could constitutionally be regulated by narrowly drawn regulations. We only hold that Lt. Flynn's suspension cannot be sustained because it is based on regulations which are, on their face, unconstitutional.

For the foregoing reasons, it is ordered, adjudged and decreed that

1) Pending further order of this Court, the Superintendent of Police of the City of New Orleans, Clarence B. Giarrusso, his successors, agents, representatives, subordinate employees, and all other persons in active concert and participation with him, be, and the same are hereby, restrained and enjoined from enforcing the suspension of Lt. Van H. Flynn from the police force for alleged violations of Police Regulations 27, 35, 80 and 83 which are, on their face, unconstitutionally vague and/or overbroad;

2) The defendant immediately reinstate Lt. Van H. Flynn as of the initial date of suspension and grant Lt. Flynn all back pay and other job benefits he would have received had he not been suspended;

3) Any and all mention of this disciplinary action be, and the same is hereby, expunged from Lt. Flynn's personnel and other related records.

The provisions of the above order are hereby conditioned on plaintiff giving security in the sum of $1,000.00 for the payment of such costs and damages as may be incurred or suffered by the defendant if he is found to have been wrongfully enjoined.

---

7. Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).